I'd like to reserve about two minutes for rebuttal here. Could you keep your voice up? Yes, sir. The court had asked that I address the one-motion rule, one-motion-to-reopen rule in these proceedings, and I note that Title VIII of the Code of Federal Regulations, Section 208.18b2, specifically exempts a special motion to reopen under the Convention Against Torture from the normal time and numerical limitations on motions to reopen. It explicitly states that so long as the motion is filed by June 21, 1999, which this motion was, that it will be considered regardless of any prior filed motions to reopen. The board here erred in force. Let me ask you about something that's on my mind. I have an interest in Castillo-Viagra, as you would guess. Yes. But I'm wondering if you reach it here. My thought was it's his burden to show that there's a probability that he will be tortured if he returns. It would seem to me that that embraces him saying, this is the regime that's in power and they torture folks like me. So you don't have, if that's the right way to conceptualize it, you don't have a Castillo-Viagra problem of the BIA talking all about a regime that's in power that wasn't at the time of the evidentiary hearing. Here, the initiative, the evidence, and the burden to address the risks under the regime in power is all Ahmad's. Well, two responses to that. First, the burden is always on the applicant for asylum, whether at an evidentiary hearing or in the context of a motion to reopen. And secondly, to excuse the board from the simple requirement of the Castillo-Viagra rule that it give notice. It's entitled to take administrative notice. It just needs to do something. On the motion to reopen, this is Ahmad's initiative, and he has to address the regime that's in power at the time of his motion to reopen. Well, Your Honor, to obviate the Castillo-Viagra rule here would require those in the context of a motion to reopen to send continuous and ongoing updates during the years and years that the board takes to adjudicate the motion. And the question would then become, oh, here's another news article. Do we send it in this week? Well, we sent some in two months ago. Maybe we should wait a few more weeks. But what if the board rules this week? We'd better send it in. So you have this mountain of paperwork. It goes to the government. The government may feel obligated to reply. It's a never-ending cycle. The board, when it's prepared to rule on the case, can simply send a letter. Hi, country conditions have changed because the government has changed. You have 30 days to respond. Send us every single thing you think is appropriate, and we'll rule on it. Otherwise, you end up with the never-ending rather circular flow of paper back and forth between the petitioner and the government, and the government's continually tied up in responding. Petitioners continually sending in new information regarding country conditions. So the ---- Let's suppose that at the time a person makes his initial application, Regime A is in power. At the time he makes his motion to reopen, Regime B is in power. Are you saying that he can make his motion to reopen addressing the risk of torture under Regime A, even though it's not in power at the time he makes his motion? It would be relevant, but he obviously should address the risk under Regime B if Regime B is in power at the time the motion is filed. The issue here ---- Why isn't my hypo applicable to this case? Because the motion to reopen here was filed while Regime A was in power under your example. The Regime B came into power after the filing of the motion to reopen, and actually for the first several years of the Musharraf regime, information was difficult to come by. I cited a front-page newspaper article issued just a few weeks before the board's decision as an example of the Musharraf regime's continuing the Pakistani tradition of assaulting and breaking up the activities and detaining the members of opposition political parties. Moreover, and again I'm not citing this as part of the record, but the most recent country report, the 2002 country report, states that in November of last year, hundreds of NQM members, Petitioner's Party, were detained by the Musharraf government and notes that the use of torture among police continues to be widespread. Now let me ask you about another phase of the case that bore on the decision. There is a distinction between persecution and torture, and the distinction between both of those and discrimination and maltreatment. Torture has to be especially severe. This fellow had evidence that the police beat him up twice when they arrested him, and it looked to me as though that was an unusually slim claim for torture, and that's the way it looked to the BIA. Why isn't it? Well, this court in Al-Sayyar v. INS examined, you have to recall, though, that this petitioner I thought that was a whole lot more severe in that case. Well, I think the facts are analogous. In Al-Sayyar, the petitioner was held in police detention, beaten, and burned with cigarettes, which our petitioner was not. Over a very long period of time. Yes. And our petitioner was detained for a week on one occasion and again for a substantial period of time on a second occasion. And on each occasion he was detained, and if you look at his declaration, it states that he was beaten to the point of semi-consciousness while being interrogated while in police detention. And that's exactly in line with the regulations describing torture. It's to elicit information, to coerce someone to drop a course of action they've been undertaking, or for discrimination of any kind. And it's clear that he was under interrogation while the beatings were taking place. The beatings were severe enough that he went into a state of semi-consciousness, and they continued throughout the duration of his detention, which went on for a week on the first occasion. And he was again detained a substantial period of time and beaten while under interrogation during his second detention. So I would submit that those beatings while under interrogation during a prolonged period of detention coincide with the facts described in Al-Sayyar, which were found to rise to the level of torture. Moreover, the Board, beyond erring as a matter of law and ignoring and failing to apply the Al-Sayyar decision, well, actually, yes, excuse me, beyond erring with regard to finding that it didn't rise to the level of torture, the Board applied in the closing sentences of its decision the improper standard for determining whether a potential torture by rival political faction members of the petitioner might qualify for relief under the Torture Convention. They applied the standard elucidated in matter of SV and matter of YLAG and RSR, and that standard was recently overruled by this Court in Jung v. Ashcroft on June 18th of this year. So the Board has applied an incorrect standard for determining whether torture by members of a political party, and if you look in the record at page 82, there's explicit evidence that the government has cooperated with the MQM-Hakiki faction. It was the last case you cited. What did that hold? The Jung case, Your Honor, held that the government, I actually have the citation here, and I provided it to counsel, held that matter of SV, matter of YLAG and RSR were overruled because they interpreted the term acquiescence as requiring the government's actual knowledge and willful acceptance of torture, and the Jung panel held that the congressional intent was to require the government's awareness that torture was taking place rather than its actual knowledge plus willful acceptance. So they squarely overruled the case cited by the Board here, and it's material in that on page 82 of the record, among other places, there's clear evidence that the government has provided support to the MQM-H in order to permit the MQM-H to carry out attacks, abductions, and torture of the MQM-A, a larger faction which is causing more trouble for the government. Counsel, I'm not much of a fan of legislative history myself, but we have this deferential approach we're supposed to take under AGIRRA, however you pronounce it. What do you say to the reference that was made in the Appellee's brief, the Board reasonably relied upon the United States Senate report regarding ratification of the Convention Against Torture, which clearly articulated that, quote, this is quoting from the Senate report, I believe, rough and deplorable treatment such as police brutality does not amount to torture, close quote. Right. Well, two points. One, under the AGIRRA, the Jung case, I believe, addresses the AGIRRA standard and rules that as a matter of law the Board erred in its precedent decisions. Secondly, police brutality in that context would be something to the effect of beating demonstrators to get them to disperse. It's inappropriate, but it doesn't rise to the level of torture. Beating someone while under interrogation during a prolonged detention rises above the level of police brutality. It makes sense to me. You're talking about the motivation aspect of torture, to get somebody to talk, but this is about the severity aspect of torture. Right. And I would say that it depends on the context. Police brutality is a rather vague term and, again, could include police wading into a crowd of demonstrators and hitting them with batons in order to force them to get to their feet and run. It's quite a bit different from having somebody in your custody completely under your control and deliberately applying force to them during an interrogation to force them to answer your questions. The context is completely different. The purpose is different, and the level of control over the victim is much higher in a custody context. A convention against torture then would apply to all countries where the police beat prisoners. If they beat them, I would say if they beat them repeatedly and forcefully. In any country where the police beat prisoners to get them to confess, anybody is entitled to come to the U.S. and stay. If they can meet their burden of showing that it rises to the level of torture, yes, Your Honor. Well, then you're saying it's possible for it to be a country where the police routinely beat prisoners to get them to confess, but it does not rise to the level of torture? Well, it's supposed to be an individualized determination, Your Honor, and that's what we're seeking here is a hearing for the petitioner. Well, let's suppose that any individual who can show that in his case, if he goes back to his country, he's likely to be arrested, which may be a valid arrest, and then beaten to make him confess. Your Honor, the purpose of the Senate's ratification of the torture convention with its understandings and reservations was to state that where a person is at risk of torture, regardless of what they may have done in the past. I want to answer my question. I'm thinking police in an awful lot of countries, conceivably the majority of them, do that, and it makes the Convention Against Torture a whole lot bigger open door than that quotation suggests the Senate meant it to be, and you don't want to talk about that. I've given you two chances. I'll give you one more. Your Honor, the Senate and the Board of Immigration Appeals and this Court, in its torture convention cases, have examined the scope of the protection available under the torture convention, and it does extend to people who are beaten severely enough for purposes of interrogation or punishment. Beating is not an appropriate lawful sanction, and the Senate made that clear in its ratification of this treaty. So to answer your question, yes, those people should and do under the law have the opportunity to apply for relief under the Convention Against Torture. It doesn't mean that every case is going to be granted. It does mean they're entitled to a hearing before an immigration judge and a determination as to whether under their individualized circumstances the treatment they experienced in the past and the treatment they fear in the future rises to the level of torture. Obviously, it's inappropriate, but we're not talking about a habeas or a 1983 case. These people are in foreign countries. We're talking about a right to stay in the U.S. despite not getting in legally. And this country has made a determination that these people will be under an order of removal and that as soon as conditions improve in their home country or as soon as we locate another country that they could safely reside in, they'll be shipped out. That's the minimal protection provided by law, and that's appropriate. Thank you, counsel. Thank you, Your Honor. Good morning, Your Honors. Carol Federighi for John Ashcroft, Attorney General of the United States, in this matter. I just want to remind the Court that this case involves a motion to reopen. The standard on a motion to reopen is whether the Board abused its discretion in concluding that Mr. Ahmed did not present a prima facie case that he is likely to be tortured if he returned to Pakistan. This is a very generous standard, and we need to keep that in mind as we look at the facts of the case. I find this reference by the Board to the change of regime in Pakistan to be rather troubling because we don't know how much weight they gave to or what the consequence of the change of regime was or what weight the Board gave to what it thought the consequence was. It sort of leaves things in a state which is a little hard to analyze. What do you think should be the proper procedure here? Well, let me just — first, I'll just talk about the significance of the administrative notice, as you call it, of the change in regime. I think the Board relied on the evidence that Petitioner had presented of the past events in Pakistan that he experienced as, you know, what is this predictive of the future? And then the stuff he had presented on the current country conditions at the time he filed his motion that referred to sort of general conditions in the country. And on that basis, he said he hadn't established a claim, a prima facie claim of — under the torture convention. The Court then did go on to say that in any event, the current country condition information he had supplied was of dubious value because of the change in regimes. Well, they made that decision after the hearing, didn't they? After the — I mean — After the — The change in — when was the change in condition? The — he filed his motion to reopen with information about the conditions in the country at the time. And the regime changed after that. And the Board decided the case then after the regime had changed. So — Under the — in our Gonzales case, didn't we say that the Board had to give him notice and sort of like a show cause or something so that he would be able to respond if the Board was going to say that the regime change was important? That's correct. But in this case, I don't believe the Board relied on that as the main basis for — I don't believe that. You know what I mean. And you know what they relied on? Well, if you read the opinion — They relied on it for two of his comments, which we don't know the significance of, and said, well, anyway, the regime changed. So what? I just find that really troubling. I — Well, the solution — counsel raised the problem of how are they supposed to handle this. Are they supposed to keep submitting things on a rolling basis? The solution is that if he believes — if Mr. Achman believes that the country conditions are still as bad or worse under Musharraf, he can — he can file another motion to reopen presenting the new information about the new country conditions. The regulations do — Is it the Board's rule? Is that what you're talking about? Yes, that's correct. Is he barred by the one-motion rule? No, the — there's an exception to the one-motion rule for changing country conditions. So he could file another motion to reopen if he believed that there — that the new regime was presenting him with a risk of torture. So that is the appropriate procedure. There is a procedure in place for that. Wouldn't it be a lot simpler to go out and notify him that the regime changed and what — did he have any comments on that subject? I — It would be a lot simpler than going through and having another motion to reopen. If the Board had felt that this was a major factor in his decision, yes, that would have been a good way to proceed. But in this case, given the — The thing is, you don't have any — when you read the Board's opinion, you don't have any idea what weight they gave to this, what — whether they thought General Musharraf was carrying on as before or whether he wasn't or whether he was a benign ruler or whatever. But you just don't know. I mean, they threw in this comment, and that leaves you wondering. That's true. But I — there's sufficient information in the rest of the opinion to sustain the decision based on the other stuff in the opinion, specifically the evidence of the past treatment, the lack of past evidence of torture, and the lack of any evidence that he was going to be currently targeted for torture if he returned to Pakistan. Counsel, this Castillo-Viagra issue on the administrative notice of the regime changes strikes me as hard. But it looks as though there were two independent grounds here. One is they say it wasn't torture. Number two, they say even if it was, the regime is gone. Could you help me on issue number one, that it wasn't torture? How do you distinguish police beating people up when they're in custody to get confessions from torture? Well, the board has drawn a line here. It's said that al-Sahir, the treatment in al-Sahir, which involved a month of beating and detention and the cigarette burning. And there's also a phrase in the opinion where the alien said that the beating had lots of monstrosities in it. So it appears it was a pretty severe incident of beating. What did they do to him that they didn't do to this guy? They burned him with cigarettes. That's one thing that's in the opinion that's different. And it's a longer period of time. It was a month. And he was also beaten with a thick electric cable. And as I said, there was a reference to monstrosity, so it's not clear what that referred to. Again, the issue is whether the board abused its discretion in drawing a line between this case and al-Sahir in saying that this case falls on the side of no torture and the other case falls on the side of torture. I guess we have a problem because the writer was too delicate to say what the monstrosities were, so it's hard for us to know what they're talking about. Correct, correct. But, again, in this case, if we look at the facts in this case, he was detained for one week on one occasion, and then four years later, he was detained for two weeks. And during the time, he was roughed up by the police. But as Your Honor has pointed out, it's quite common for aliens presenting claims to have that level of treatment, and the board, in its discretion, decided that this does not rise above a severe inhuman treatment, as the And there's no evidence further that ---- If you can give me any more help, here's the thing. There are very few countries that I would really care to be arrested and put in custody in, maybe England. But judging from what some of the IRA prisoners say about their treatment, if their allegations are right, I don't know about England. I don't know where I'd want to be arrested and in custody. It sounds from the stories you read like it's bad all over. But I don't have good, really clear language to draw the line between police beating people up and torture. And I'm pretty confident that Congress didn't mean to open the door to everybody from countries where police beat people up. It's just too many people, too many countries. It doesn't seem very likely. So give me what the formula is, if you can, and some authority. Well, I think this is what the board is trying to work out through these cases. I mean, these are all fairly new issues, a torture issue, and the board is trying to work it out. And it's up to the Attorney General through the board to come up with a formula. As of now, the board decided that this level of treatment and this evidence, it may have been that the beatings he had were particularly severe, but there's no evidence of that. He didn't say he was hospitalized afterwards. He didn't really present much detail about the beatings, what happened to him during the beatings. Without any further detail other than the fact that he was beaten up while in custody, the Attorney General through the board has decided that doesn't rise to the level of torture. And, again, the standard on a motion to reopen is very deferential. It's an abuse of discretion standard. The petitioner has to establish a prima facie case, which the board is allowed to make a heavier showing than a regular case. In this instance, the board did not abuse its discretion in deciding to draw the line between Mr. Ahmed and Al Shakir. There's got to be a definition. There's got to be. You can't write decisions without them. I mean, is it torture if they make you listen to Barbara Streisand songs all day? I don't know. There is a definition in the regulations that talks about torture being an extreme form of inhuman treatment. As far as fleshing that out, that's going to happen through the case law, through the board decisions, and that's what they're working on. In this case, the board concluded it did not rise to the level of torture for a lot of the reasons that you pointed out earlier. So in the absence of further questions, I'll submit the case. Thank you, Counsel. Was any time reserved? Pardon? You were a little over. When it was read that it was counting up how much over you were. Thank you, Counsel. So Achmad v. Ashcroft is submitted. Go ahead and recite it. You gave it to opposing counsel, right? I did. Thank you. Thank you, Counsel. Achmad v. Ashcroft is submitted. United States v. Carrillo. Counsel?
judges: Cudahy , Kleinfeld,jones